AUGUST THIEL and MARGARET THIEL

v.

RANDOLPH PERKINS and the TUTTLE CORPORATION.

[Decided September 25th, 1916.]

1. Where A. and B. made a contract of sale of land, which was afterwards consummated by delivery and acceptance of a deed, and A. afterwards filed a bill for reformation of the contract on the ground that, by

mutual mistake, the contract did not call for the conveyance of the land upon which a building was erected, the building as a fact encroaching upon adjoining land, but only covered a lot twenty-five by one hundred feet—*Held*, that the evidence shows that the parties contracted for the conveyance of a lot twenty-five by one hundred feet, which was duly conveyed, and the agreement for sale should not be reformed.

2. Where A. filed his bill for reformation of a contract to convey lands on the ground of mutual mistake, and one year afterwards, before that suit was tried, filed an amended bill asking for a rescission of the contract on the ground of mutual mistake as to the location of the building upon the lands, and during that year the building greatly deteriorated— *Held*, that he is not entitled to the rescission of the contract because by filing his original bill he abandoned all claim to rescission, and was not equitably entitled to such rescission when he amended his bill and changed the whole ground of his suit, because, on account of the deterioration of the building, he is unable to convey it back in the condition it was in when he commenced this suit solely for reformation.

On suit to effect rescission of a conveyance of corner lot and brick building thereon on the ground that the parties were under a mutual mistake in supposing that the building rested wholly on the lot, whereas it encroached upon adjacent property belonging to third parties. Alternative relief of reformation prayed for.

*Mr. J. Emil Walscheid*, for the complainants.

*Mr. Marshall W. Van Winkle* and *Mr. Randolph Perkins*, for the defendants.

STEVENSON, V. C.

The important question in this suit is whether, under the circumstances proved, the vendee of a corner lot twenty-five by one hundred feet, in the town of Guttenberg, is entitled to have the whole transaction rescinded because both grantor and grantee were under a mutual mistake—both supposing in good faith that the brick building, which apparently occupied the corner lot, stood wholly within the boundaries of the lot, whereas in fact the brick walls encroached on adjacent property and on the street at certain points about an inch and a half, a condition which greatly injured the value of the structure.

*92 N. J. Eq.*                    Thiel *v.* Perkins.

1. It is somewhat surprising that the diligent efforts of industrious counsel have produced no case in which rescission has been sought on the ground of an encroachment of a building covering the land conveyed which was unknown to the parties—in fact, unsuspected by them and undiscoverable by careful observation with the eye.

If a vendor offers a corner lot for sale, with a valuable brick building apparently covering it, and conceals the fact known to him that the building encroaches upon adjacent property owned by a third party, it may be conceded that a clear case of fraud is made out—fraud which consists in *suppressio veri*—and that the right of the vendee to relief is not affected by the fact that he refrained from making a survey which would have disclosed the encroachment. A vendor is guilty of fraud when he falsely represents that there is no mortgage upon the property, whereas there is a mortgage duly recorded which the vendee would have discovered if he had made a search. It is unnecessary to point out that the neglect of a vendee to search the public records when purchasing real estate has far more fatal effect in the way of depriving him of remedies than his failure to have a survey made to see whether the owner of a lot twenty-five by one hundred, which he is about to buy, or such owner's predecessors in title, have been foolish or careless enough to erect an expensive brick building covering the lot without having the walls of the building located in accordance with an accurate survey.

A variety of cases may be stated which it would be perhaps very difficult to place in one class and under the operation of one rule with respect to liability on account of an encroachment as between vendor and vendee.

If the vendor himself erected the building, and this fact is known to the vendee, it would seem to be somewhat harsh to hold that the vendee could not accept the offer of the property as a representation on the part of the vendor that he had erected the building upon his own land, and not in part upon the land of his neighbor. If the vendor knows what the truth is and knows, as, of course, he must, that the truth is not discoverable by the eye, and that the vendee unless he makes a survey will be deceived, the case would seem, as I have above intimated, to be

6

one of fraud. If both parties are innocent it would seem to be a case of mutual mistake, and there are strong grounds for holding that generally the vendor is responsible as the cause of the mistake.

When we take the case of a building which was erected by a former owner, the present owner and grantor being ignorant of the encroachment, there seems to be room for considerable argument concerning the comparative equities of the parties and the just allotment of liability. In other words, the question then arises whether when men buy and sell real estate in good faith the vendee does or does not take subject to what a survey would disclose, and if he sees fit to carry out the transaction without a precautionary survey, whether he must not under the old rule "look to his covenants."

In the present case the right of the complainant to rescind is more difficult to establish because of the history of the lot and building in question. Treating the defendant the Tuttle Corporation, the holder of the title, who made the deed to the complainants, as the mere agent and trustee for Mr. Perkins, and treating Mr. Thiel as representing his wife as well as himself, it appears that Mr. Thiel, or his attorney, in some degree was responsible for the original honest but erroneous belief among all these parties that the brick building was located wholly within the lines of the corner lot twenty-five by one hundred feet. Without going into the more or less complex transactions between the parties which preceded the conveyance from the Tuttle Corporation to the complainants, which conveyance they now seek to rescind, it is enough to point out that Mr. Thiel filed a lien claim against this building and the curtilage upon which it was alleged to have been erected, and described the curtilage as lot 414, in block 27, on a certain specified map, declaring that the lot was situate on the northeast corner of Hermann avenue and Second street. All parties to this whole transaction at all times knew that this corner lot was twenty-five by one hundred feet. Mr. Thiel, so far as he is concerned, swears to this fact positively. Mr. Thiel, or his attorney, who drew the lien claim, thus placed on record the representation that the brick building in question was erected upon the curtilage described, viz., this

corner lot twenty-five by one hundred feet. If Mr. Thiel is to be charged with notice that the walls of this building upon which he filed his lien encroached upon the neighboring lot, and, notwithstanding that fact, filed his lien claim, and carried through the proceedings thereon to an execution sale, and stood by, as he did, at such sale and gave no notice of the facts to purchasers, it would seem that, according to the argument now made in this case on behalf of the complainants, any purchaser at such sheriff's sale would have a right to a rescission as against Mr. Thiel upon discovery of the encroachment.

If, however, as no doubt was the case, neither Mr. Thiel nor his attorney had any suspicion that the curtilage which was described in the lien claim did not contain the entire building, then a different situation, of course, would be created which need not now be discussed. The point to be observed is, that Mr. Thiel, being the cause of the representation that the corner lot contained the whole building, and was the curtilage upon which it was erected, prosecuted his lien claim suit to judgment and caused a sheriff's sale of the property described in the lien claim to be held, at which sale the property was offered in its apparent condition, no notice being given of those encroachments which were apparently discoverable only by a survey. At the sheriff's sale Mr. Perkins, having a mortgage interest which he held as trustee of an estate to protect, made an arrangement with Mr. Thiel—a bargain was made between the two—by which Mr. Perkins bought in the property for the amount of Mr. Thiel's claim, something over $1,100. Mr. Perkins had no notice of the encroachment, but bought the property under the same mistake under which it was subsequently purchased by Mr. and Mrs. Thiel. The sheriff's deed, by the direction of Mr. Perkins, was made to his agent or trustee, the defendant the Tuttle Corporation. Mr. Perkins had no personal interest in this property but acted as trustee for an estate and the Tuttle Corporation, his agent, held the property for the protection of the mortgage and other interest of this estate, of which Mr. Perkins was the trustee.

It thus appears that Mr. Thiel not only brought on the sale of this property and caused it to be offered for sale to the public,

without giving notice of the encroachment, but actually allowed Mr. Perkins, in ignorance of the encroachment, to pay out over $1,100 of money of his trust estate for his (Mr. Thiel's) benefit and take a conveyance of the property for the benefit of that estate.

After further transactions in regard to this property, which need not be set forth, a further deal was made between Mr. Perkins and Mr. Thiel, by which the property in question was conveyed by the Tuttle Corporation to Mrs. Thiel, and Mrs. Thiel gave back to Mr. Perkins as trustee as part payment a mortgage on certain lots owned by her to secure the amount due to Mr. Perkins as trustee on his original mortgage. As a part of the deal it was agreed that the amount bid by Mr. Perkins at the lien claim sale and paid by him from his trust estate to the sheriff should be returned to Mr. Perkins.

Starting with the assumption that in the simplest case first above stated, where the vendor himself has erected the building, the vendee, in case he discovers an encroachment greatly injurious to the building, which was unknown and unsuspected by either party, has a right to have the contract rescinded upon prompt application after discovery of the mutual mistake, the question, I think, still remains whether a vendor in the situation of Mr. Perkins or the Tuttle Corporation must bear the loss from the encroachment in favor of a vendee in the situation of the complainants.

If we make the further assumption that, if the vendor himself purchased the property in ignorance of the encroachment and innocently conveyed it to his vendee, both parties being under an honest mistake in regard to the location of the building, the vendor has in fact made a misrepresentation by holding out the property for sale with the building apparently located wholly on the lot, and therefore the vendee is entitled to the remedy of rescission, I think that even with such an assumption of law and fact a question yet remains for discussion as to the liability of Mr. Perkins or the Tuttle Corporation under the facts and circumstances above set forth.

Whatever my own impressions may be, I do not find it necessary to answer these questions in order to arrive at a determina-

tion of this present case. For the purposes of the further discussion of this case I shall assume that the defendants would have been liable to a decree in favor of the complainants rescinding this conveyance on the ground of mutual mistake, if application for such remedy of rescission had been made by the complainants promptly upon the discovery of the encroachment— the discovery of the mutual mistake.

2. The building in question was in an unfinished condition when the bargain was made between Mr. Perkins and the Thiels which the Thiels now seek to rescind.

On October 2d, 1913, the Thiels after having an expert examination made of the building in its then condition, and an estimate of the cost of completion, entered into an agreement with Mr. Perkins which was drawn by him on one of his office letterheads and reads as follows:

"Agreement made between Randolph Perkins and August Thiel and Margaret Thiel, his wife.

"Perkins agrees to sell and Thiel to buy unfinished building corner Hermann avenue and Second street, Guttenberg, for $2,700 mortgage on Thiel's properties Nos. 863, 864, 865, 866 and 867 on Hermann avenue and 3d street, Guttenberg, and $1,111.69 now in hands of sheriff realized from sale in *Thiel* v. *Perkins.* Title of Thiel's property to be satisfactory to Perkins. Perkins agrees to convey free and clear of all encumbrances. Thiel to give order to sheriff for said sum.

"(Signed)  RANDOLPH PERKINS.
AUGUST THIEL.
MARGARET THIEL."

This agreement was within a short time after its execution carried out by both parties. Mr. Perkins caused his holding agent, the Tuttle Corporation, to execute a warranty deed not to August Thiel and Margaret Thiel, but by Mr. Thiel's direction to Margaret Thiel alone, by which deed this same lot described in the lien claim and sheriff's deed, viz., lot 414, in block 27, was conveyed, no mention being made of any building. The deed bears date November 6th, 1913, and was proved before a master in chancery on that same day, and was recorded in the Hudson county register's office the next day, November 7th, 1913.

It is unnecessary, I think, for the further consideration of this case to go back of this contract of October 2d, 1913. The build-

ing had stood in an unfinished condition for two or three years, but the evidence indicates that it had only slightly deteriorated, if at all. However that may be, the complainants made their bargain with full and accurate knowledge of the condition of the building, and bargained for that building as it then stood.

On November 6th, 1913, Mrs. Thiel thus became the owner of this property. It has not been argued, however, that she occupies any better position than she would have occupied if the conveyance had been made in accordance with the contract to both herself and her husband.

A few days after the conveyance to Mrs. Thiel, Mr. Thiel was informed by the owner of one of the adjoining lots that the building encroached on his property, and thereupon Mr. Thiel had a survey made which disclosed all these encroachments upon the two adjacent lots and upon the streets. Mr. Thiel promptly gave notice of the encroachments to Mr. Perkins, and the result was a series of conferences and considerable correspondence in which the Thiels were aided by their counsel, Mr. Walscheid.

Although the matter is in dispute I shall assume that the Thiels at first demanded of Mr. Perkins that the whole contract in all its parts be rescinded, and that Mr. Perkins induced them to withdraw that demand, or to let it remain in abeyance upon his assurance that he would procure conveyances from the adjacent lotowners of the land over which the building encroached or an easement which would be amply protective. The engagement on the part of Mr. Perkins included the procurement of conveyances of real estate but was not put in writing. I have adopted the view for the purposes of this case that the attitude of the parties was as follows:

Mr. Thiel, for himself and through his counsel, said to Mr. Perkins:

"You must rescind this whole contract on account of these encroachments which destroy a large part of the value of what we bought and prevent us from borrowing any money to complete the building."

Mr. Perkins, recognizing either a legal or moral obligation, and very naturally assuming that he could easily acquire for fifty or one hundred dollars a strip of land one hundred and

*92 N. J. Eq.*                    Thiel *v.* Perkins.

twenty-five feet long and less than two inches, perhaps, less than one inch, wide, on the average, came back with what Mr. Walscheid calls a counter-proposition, viz., that he (Perkins) should procure the conveyance from the adjacent lotowners necessary for the protection of the building. The parties do not seem to have made any legally enforceable agreement and no provision was made for what was to be done in case Mr. Perkins should be unable to procure conveyances from the adjacent lotowners.

Assuming, as we now are, that the complainants made a prompt demand for a rescission, I think that during the period of one year which followed before this suit was commenced, the attitude of the parties may be stated as follows: The complainants demanded rescission. The defendant Mr. Perkins, by his representation made in good faith, that he would acquire the necessary strips of land, induced the complainants to stand still and await the result of his efforts. The complainants agreed that if Mr. Perkins would procure these necessary conveyances they would accept the same in settlement of all claims. I do not think, therefore, that if a demand for a rescission was made the same could be deemed absolutely withdrawn because the complainants were induced by Mr. Perkins' representations and promises to stay the enforcement of that demand.

At the suggestion of Mr. Perkins, Mr. Thiel undertook to negotiate with the owner of the lot on the east for the desired conveyance. It is proved that this lot, which was vacant, was worth about $1,200. The owner, who was aware of the encroachment, declared that he would not sell less than a strip six inches wide, and for such strip his price was $500.

Mr. Perkins declined to pay $500 for $24 worth of land. In fact, the necessary strip two inches wide was worth about $8. In view of the persistent attitude of this lotowner no effort was made to acquire the desired strip twenty-five feet long on the northerly side of the property. As to the encroachments on the street, the parties seem to have felt assured that no public complaint would be made, and the Thiels were willing to consider their demand satisfied and to keep the property if all danger on account of the encroachment upon the lot on the east and the lot on the north was removed by appropriate conveyances. It will

thus be seen that in the end of 1913, or the early part of the year 1914, the complainants consented to remain the owners of the property at least for a reasonable time in order to give Mr. Perkins a fair opportunity to make good his representation and promise and procure the required protective conveyances. The complainants and their counsel repeatedly urged Mr. Perkins to carry out his undertaking, and it is evident that Mr. Perkins was greatly embarrassed by what he deemed the extortion which one of the lotowners was endeavoring to practice upon him.

Continuing the assumption in favor of the complainants, I shall assume that the complainants by their delay at the request of the defendant Perkins did not waive or in any manner lose their right to a rescission in case of Mr. Perkins' failure to make the settlement which had been agreed upon. It is, however, a very different question whether in view of the serious deterioration of the building which took place during the year 1914, the complainants had a right to refrain from properly protecting the building which they owned, and which they expected to continue to own, in case Mr. Perkins could obtain the desired conveyances, and then upon renewing their demand for rescission, force upon Mr. Perkins the building which they had allowed to go partly to ruin under the action of the elements and the spoliation of marauders. Ordinarily, under the well-settled rule, rescission is granted only upon a restoration of the original status. He who rescinds must surrender and restore what he received under the contract which is rescinded. It is argued that Mr. Perkins caused this delay, and it may be that this fact should be deemed a complete defence against any charge of waiver or laches. But was Mr. Perkins bound to take possession of the premises, put on a roof and close the open side on the street so as to exclude trespassers? There is no evidence that the complainants owning, and hoping to continue to own, the property, requested Mr. Perkins to take possession of the property or enclose the open side sufficiently to exclude trespassers. The evidence indicates that the protection of the property against the elements and against trespassers could have been accomplished at a comparatively small cost. The boards were on the roof, and, as Mr. Thiel testified, "all it needed was the tinning."

Accepting the view of the situation most favorable to the complainants, we find that, first, they demanded rescission which involved an immediate surrender of the property by them to Mr. Perkins or the Tuttle Corporation. Next, they agree with Mr. Perkins that they will for a reasonable period remain the owner of the property, and in case within that period Mr. Perkins shall procure the desired conveyances from the adjacent lot-owners, then they will accept such conveyances, withdraw absolutely their claim to a rescission, and remain permanently the owners of the property already conveyed to Mrs. Thiel. If Mr. Perkins failed to procure the conveyances, we are assuming, in favor of the complainants, that they might successfully urge their right to a rescission, but down to this stage in the proceeding the complainants were to remain owners. The complainants did not assent to this proposition to give Mr. Perkins time to get the conveyances upon the condition that Mr. Perkins should discharge any of their duties as owners. There certainly seems to be cogency in the argument that just as Mr. Perkins was to spend his time and money during the reasonable period of delay in order to procure the conveyances, so the complainants were to stand as owners and take care of the property in order that at the end of the period in contemplation they might, in case they were obliged to renew their demand for a rescission, tender the property substantially in the same condition in which it was when they took it and when they made their attempted settlement with Mr. Perkins.

I shall, however, also leave undecided this question of the right of the complainants to a rescission upon a reconveyance from them to the Tuttle Corporation of this property in its then condition, at the end of the period of delay caused by Mr. Perkins, or, to be more specific, we may say at the time of the commencement of this suit in November, 1914. The evidence shows that this year was a period of great depreciation of the property—that during this period the complainants allowed the property to remain wholly unprotected against the elements and against trespassers.

The complainants were held off as above set forth for a period of nearly one year until their patience was exhausted, and they

thereupon commenced this suit. The original bill of complaint was filed in this court on November 17th, 1914, about ten months after the arrangement for a settlement was made between the complainants and Mr. Perkins. This bill of complaint sets forth the agreement of October 2d, 1913, which provided for the conveyance of the property in question to Mr. and Mrs. Thiel, the complainants. The bill then alleges that it was expressly agreed that in addition to the unfinished building Mr. Perkins "was to convey the lands upon which it was erected," and that it was the intention of the parties to make a contract for the conveyance of the land as well as the unfinished building upon which it was erected, and that through the mutual mistake of the parties the words "and the land upon which it is erected" were not inserted in the fifth line of the agreement after the word "Guttenberg," and that therefore the agreement does not truly express the intention and meaning of the parties.

The bill further alleges that the complainants have performed the contract on their part by delivering the mortgage for $2,700 and giving an order on the sheriff for the sum of $1,111.69, and that the sheriff had turned over the money to Mr. Perkins, and that the complainants did not discover the mistake or omission in the written agreement until they had performed it on their part, and that thereupon they called upon Mr. Perkins to perform his part, and that he (Perkins) then "refused to convey" to the complainants, "in addition to the unfinished building, the land upon which it was erected."

It will be observed that not the slightest mention is made in this bill of the deed of conveyance from the Tuttle Corporation to Mrs. Thiel in performance of this contract. The Tuttle Corporation is not made a party to the suit. The sole defendant is Mr. Perkins, and the prayer for relief is that "said agreement be corrected and reformed so as to have inserted therein" the words above mentioned, at the point indicated, "so as to express the true intention of the parties thereto." The usual prayer for further and other relief is added. Assuming that prior to the commencement of this suit there is room for argument concerning the position of the complainants with reference to the rescission of the contract of October 2d, 1913, their position was

sharply defined and absolutely fixed when their bill of complaint was filed. In that bill the complainants did not ask for any rescission of the contract involving a restoration of the status on both sides, but, on the contrary, they came into court as the owners of the property, reaffirming the contract which they now seek to rescind, and praying that the contract might be reformed in order that it might be further enforced. No alternative cause of action was presented, and no alternative relief was prayed for. The omission of the Tuttle Corporation as a defendant excluded the possibility of any rescission of the contract of October 2d, 1913, because that contract had been carried out by the conveyance from the Tuttle Corporation to the complainants, and the execution and delivery of the mortgage covering Mrs. Thiel's lands from the complainants to the Tuttle Corporation. The complainants came into this court saying:

"We stand upon the agreement as the parties intended to make it. We expect the performance by Mr. Perkins of the agreement as it was drawn, and we hold, and intend to hold, the fruits of that performance. What we want is to have the agreement reformed so as to extend the scope of Mr. Perkins' obligation and then sue at law for damages because of his failure or inability to carry out the provision which we ask to have added to the agreement by the decree of reformation."

All claim to a rescission of the agreement of October 2d, 1913, was plainly abandoned when this bill was filed, and no intimation was given that if this suit for reformation should fail the complainants proposed to endeavor to revive the inconsistent or alternative claim to a rescission.

The answer of the sole defendant, Randolph Perkins, to this original bill of complaint was brief, and amounts practically to a denial of the alleged mistake, and an allegation that it was the intention of the parties that the property acquired by Mr. Perkins through the mechanics' lien sale should be conveyed, and that the complainant August Thiel knew that the title acquired at said sale was all that it was possible for Mr. Perkins to convey to the complainants, viz., lot No. 414, in block 27, &c. The order referring this case to me for final hearing was made on March 18th, 1915, and the case came on for final hearing on November 9th, 1915, at which time the pleadings were read, or

in some way the nature of the complainants' case was expounded. Some colloquy then took place between court and counsel, in which it was suggested that a case of rescission was indicated rather than a case of reformation, and the propriety of amending the bill and bringing in the Tuttle Corporation as a party defendant was suggested. The hearing was then adjourned by a brief order until the 16th day of November, 1915, and leave was given to the complainants to amend their bill so as to present a case of rescission and make the Tuttle Corporation a party defendant. I do not think that this application was resisted by counsel for the defendant. November 16th, 1915, was a regular motion day, and, presumably, this short adjournment was made in order to give the counsel for the complainants an opportunity to look into the questions with which he had been unexpectedly confronted.

On November 16th, 1915, counsel for complainants took an order reciting that an amended bill had been theretofore served on Mr. Perkins, which amended bill made the Tuttle Corporation a party defendant, and directing that said amended bill be filed, and that the defendant Randolph Perkins do answer the same within twenty days, and that the complainants forthwith issue a subpœna to bring in the Tuttle Corporation, and that the Tuttle Corporation have the time allowed by law in which to answer the amended bill, and that the hearing of the cause be continued to the 3d day of May, 1916.

The amended bill, filed just one year lacking a day after the original bill for reformation had been filed, sets forth practically a new case which presented to the court, not the facts including particularly the condition of this building as it stood at the commencement of the suit, but the facts including the condition of this building as they stood a year later. The amended bill sets forth the agreement between the complainants and Randolph Perkins individually, dated October 2d, 1913, and that in performance of the agreement the complainants gave the mortgage and order for the $1,111.69 mentioned therein, and that Perkins, in consideration of the performance of the agreement by the complainant, caused to be conveyed by the Tuttle Corporation to Margaret Thiel, with the consent of August Thiel,

"a certain lot of land known as lot number four hundred and fourteen (414), in block twenty-seven (27) on the map of Guttenberg aforesaid, being twenty-five feet wide in front and rear and one hundred feet deep as by reference to said map will more fully and at large appear."

The amended bill further alleges the omission from the agreement of the words set forth in the original bill, and further alleges "that said contract as it now stands does not truly express the intention of the parties thereto."

The amended bill further states that the complainants accepted the deed from the Tuttle Corporation for said lot No. 414, believing that said deed "conveyed to your oratrix, Margaret Thiel, said unfinished building and the lands and premises upon which the same is erected."

The amended bill then sets forth that subsequent to the making and recording of the deed from the Tuttle Corporation to Mrs. Thiel, the complainants discovered the encroachments and immediately notified Mr. Perkins of the same. The arrangement between Mr. Perkins and the complainants for the acquisition of the necessary strips of land, and the frequent calls which the complainants made upon Mr. Perkins to carry out the arrangement which had been agreed upon, are then set forth. The bill then alleges that the complainants did not seek the aid of this court for the protection of their rights owing to the promises which Mr. Perkins had made until January 5th, 1915, when they filed their bill. The date of the filing of the bill was not January 5th, 1915, but November 17th, 1914.

The amended bill alleges also that the original bill prayed for a reformation of the contract of October 2d, 1913, "so that said contract should agree to sell and convey" the unfinished building, "together with the land upon which it is erected," the complainants "intending on the reformation of said agreement to institute an action at law against said Randolph Perkins for damages by reason of his failure to convey unto your orators the unfinished building aforesaid, together with the lands upon which the same is erected."

The amended bill then sets forth that the suit came on to be heard on November 9th, 1915, and counsel for "complainants having opened the cause to the court, your orators were advised

that their remedy in the premises might perhaps be by prayer for rescission and cancellation of the contract aforesaid, instead of by reformation of the same; whereupon your orators begged leave of the court to continue the hearing of said cause to some future day with permission in the meantime to amend the bill of complaint by them theretofore filed, so that said bill of complaint should include, in addition to the facts essential for reformation and a prayer for reformation, a statement of facts necessary to give the court jurisdiction of a prayer for rescission of said contract, and the hearing of said cause was thereupon continued to the sixteenth day of November, A. D. nineteen hundred and fifteen, with permission to your orators to amend and serve their amended bill of complaint in conformity with their request as aforesaid."

This frank declaration of the intention of the complainants in seeking the reformation of the agreement is certainly significant. It shows distinctly that the complainants stood as owners of the property claiming the right and boldly declaring their intention to remain such owners. They occupied this position for a year after they commenced their suit. This declaration, also, in the light of the other facts and circumstances of this case, discredits the complainants' claim that they sought at the start a rescission of the contract, and sustains Mr. Perkins' contention that what they originally sought was compensation in some form for the loss which they had suffered on account of the mistake. If what the complainants originally sought for was rescission, and they then merely held their claim in abeyance in order to give Mr. Perkins a chance to relieve them from the effects of their mistake, why, it may be asked, when they became tired of waiting upon Mr. Perkins, did they not renew their claim to a rescission and bring their suit to accomplish that result? The definite position which they took in their original bill that they intended to hold onto the property which they had received, make no claim to a cancellation of the mortgage on Mrs. Thiel's lands and leave Mr. Perkins in possession of the $1,100 while they brought an action against Mr. Perkins for damages, seems to accord far better with the defendants' theory of the original

position which the complainants took than it does with the complainants' theory.

The point, however, at present in mind is the conduct of the complainants from the commencement of this suit until their amended bill was filed in its relation, not to any defence of laches or ratification, but to the defence that while they stood before the court as the absolute owners of the property, and claiming their right to remain such owners, they suffered it to fall into ruin so as to make a restoration of the status even as it stood at the commencement of the suit entirely impossible.

The amended bill further alleges that the complainants "now are, and always have been, ready to rescind and cancel the contract aforesaid, and now are, and always have been, ready to reconvey unto the Tuttle Corporation aforesaid, or unto the said Randolph Perkins, the lands and premises received by the said Margaret Thiel from the said Tuttle Corporation by the deed aforesaid, and do now tender themselves ready and willing to execute such deeds of conveyance for said land upon such terms and conditions as may be imposed by this honorable court upon a decree rescinding the contract aforesaid."

The prayer of the amended bill is in the alternative that it may be decreed that the contract of October 2d, 1913, be rescinded and canceled, and that the complainants "be restored to all things which they have lost by reason of the making of said contract and the actions of the parties subsequent thereto," or, in the alternative, that it may be decreed that the said agreement be corrected and reformed so as to have the words above mentioned inserted therein at the place indicated.

If the application of the complainants for leave to make these radical amendments of their bill had been resisted, I am by no means sure that such amendments would have been allowed. It is not worth while, however, to pause to consider this matter. What in fact the complainants did was to file an entirely new bill containing a cause of action which was inconsistent with that which had been set forth a year before in the bill of complaint as originally filed, and which could only be established as an alternative of that original cause of action. As stated before, the new cause of action presented by the amended bill included

necessarily the consideration of facts and circumstances as they existed in November, 1915, and not merely the facts and circumstances as they existed in November, 1914. This new cause of action required a new party defendant, the Tuttle Corporation, to be brought in.

The answer of Mr. Perkins to this amended bill, as hereinbefore stated, sets up the deterioration of the property, the practical destruction of the building down to its foundations, resulting from neglect of the complainants to protect the same. In brief, this defence is based upon the proposition that the complainants are not entitled to a decree of rescission because they are unable to restore the property to Mr. Perkins or the Tuttle Corporation in the condition it was in when the contract was made on October 2d, 1913.

I think this defence is sustained if the evidence shows that for the whole year during which the complainants were prosecuting this suit upon their original bill for reformation only, the property suffered substantial deterioration. The evidence does show that during this year, November, 1914, to November, 1915, the building suffered a very great deterioration in value under the operation of the causes hereinbefore referred to. When the amended bill was filed the defendants, in my judgment, were not obliged to accept back this building even if we may assume that they would have been obliged to accept the building in its then condition when the original bill was filed in November, 1914, in case that bill had set forth a case of rescission and had not ratified the conveyance from the Tuttle Corporation to Mrs. Thiel.

Whatever may be the true equitable rule in regard to the obligation of the complainants to preserve this building from falling into ruin during the year in which Mr. Perkins' promises and representations had induced them to delay their suit, I do not think there can be any doubt about the equitable rule to be applied one year after this suit solely for reformation had been commenced. Mr. Perkins, it seems to me, had a right to come into court when this amended bill presenting a new cause of action was filed on November 16th, 1915, and say in answer to the bill: "Conceding that if you had filed this sort of a bill and asked for rescission a year ago, it would have been my duty to

submit to rescission and take back this building in its then condition, nevertheless, you had no right to postpone your claim for rescission for a year, stand hard and fast on your ownership of the property, claim the right to retain the property and sue me for damages because I did not convey more property to you, and now, at the end of the year, change the whole character of your suit, pray for a rescission of the contract and demand that I shall take back the building in its present condition, when during the year it has been greatly damaged by the elements and by the plundering of trespassers."

I am not suggesting that the lapse of this year while this suit has been pending, as a mere suit for reformation, is to be deemed a period of laches on the part of the complainants. The question of laches is not under discussion. The defence under consideration is not that the amended bill praying for rescission was filed too late, but that when it was filed the complainants had rendered themselves by their neglect of the property incapable of conveying it in the form it was in a year before.

3. The argument in this case has related to the claim to rescission first presented in this cause by the amended bill, but the amended bill also endeavors to present in the alternative the original case for reformation, and in the alternative prays for such relief.

The statements of the amended bill without the aid of the testimony would seem to destroy the original fanciful claim of the complainants that the subject-matter of the bargain was the parcel of land, whatever its shape or size, upon which the building rested. According to this theory, if the building had occupied a parcel of land on the corner of these streets, having a width of twenty-four feet and ten inches, the Tuttle Corporation would have performed this contract if it had conveyed this parcel to Mrs. Thiel, and had remained the owner of a strip of land two inches wide and one hundred feet deep. Mr. Thiel swears positively that he knew that he was buying this corner lot, No. 414, in block 27, and that this lot had a frontage of twenty-five feet. Mr. Thiel also knew that Mr. Perkins owned this corner lot, twenty-five feet wide and no more, and knew the

history of his title which rested upon Mr. Thiel's sheriff's sale under his lien-claim judgment and execution.

But the conduct of the parties in carrying out this contract establishes what the subject-matter of the contract was beyond all question. The Tuttle Corporation gave, and the Thiels accepted, in performance of the contract on the part of Mr. Perkins, a deed conveying this corner lot (No. 414) without making mention of any building. The amended bill alleges as follows:

"Your orators accepted the deed from the Tuttle Corporation aforesaid for said lot No. 414, in block 27, on the map of Guttenberg aforesaid, believing that said deed conveyed to your oratrix, Margaret Thiel, the said unfinished building and the lands and premises upon which the same is erected."

Inasmuch as Mr. Thiel knew that lot 414, this corner lot, was twenty-five feet wide by one hundred feet in depth, and the deed which he accepted described this lot of land and no more, he believed, as alleged in the bill, that the unfinished building stood wholly on this corner lot. The mistake that was made, we may surmise, originated with the party who erected the walls of the building. Presumably, that party did not intentionally encroach but "believed" that the walls had been located wholly upon the corner lot twenty-five by one hundred. Mr. Thiel, or his attorney, when Mr. Thiel's lien claim was filed, unquestionably, were under this same mistake, and they supposed that the "curtilage" on which the building was erected consisted exclusively of this corner lot twenty-five by one hundred feet. Mr. Perkins was under the same mistake when he made the arrangement with Mr. Thiel, in pursuance of which he bought in the property at the lien claim sale, and had the sheriff convey the same to the Tuttle Corporation. Mr. Thiel, his wife and Mr. Perkins were under the same mistake when they made their contract on October 2d, 1913—the contract which the bill of complaint in one aspect prays in the alternative to have reformed.

I am unable to see the slightest justification for the proposition that these parties did not contract for the corner lot, which was conveyed and accepted in performance of the contract, but that they contracted for a parcel of land, the dimensions of which

were measured by the size of this building, and that Mr. Perkins intended to convey such a lot whether he owned it or not.

4. When the amended bill was filed praying in the alternative for rescission a year after the suit had been commenced solely for a reformation, the Tuttle Corporation became a necessary party, and, accordingly, was brought in as a defendant. Randolph Perkins, individually, remained as the other party defendant. Neither Perkins, as trustee, nor the beneficiaries of his trust were brought into the suit, although it appeared from the pleadings that the mortgage for $2,700 given by Mrs. Thiel to Mr. Perkins, as trustee, was necessarily involved in the suit and would be liable to rescission and cancellation if such a decree passed against the Tuttle Corporation and Randolph Perkins. It was admitted, however, by counsel, and I think it also appears from the testimony, that this mortgage at some time was paid off. It was stated, and I think agreed to by counsel, that a suit had been brought to foreclose this mortgage, and that the same had gone to decree, and that the property, the lots of Mrs. Thiel, had been sold under execution upon such decree. It would seem, therefore, that Mr. Perkins' estate, his beneficiaries, are not interested in this present suit on account of the mortgage for $2,700.

The situation, however, is somewhat peculiar. The right of the complainants to rescind this contract of October 2d, 1913, involves necessarily the right to rescind the deed from the Tuttle Corporation to Mrs. Thiel, and the mortgage from Mrs. Thiel to Mr. Perkins, as trustee, and the right to rescind the assignment of money from Mr. Thiel to Mr. Perkins individually or as trustee. One of these connected transactions cannot be rescinded while the others stand. In the absence of allegations in the pleadings and of evidence and argument in regard to this foreclosure suit and decree, I dismiss the matter without consideration. It may be that as between Randolph Perkins, as trustee, and the beneficiaries of his trust estate on the one hand, and Mr. and Mrs. Thiel on the other, it is *res adjudicata* that this mortgage was unaffected by any mistake, and that in respect to it the complainants were not entitled to any decree of rescission.

Central R. R. Co. *v.* Mayor, &c., Jersey City.          *92 N. J. Eq.*

5. For the reasons hereinbefore set forth, I find that the complainants are not entitled to a reformation of the contract of October 2d, 1913. If they were entitled to a rescission of that contract upon discovery of the encroachment, in November or December, 1913, and remained entitled to such rescission until they commenced this suit in November, 1914, I think it is clear that by suing solely for reformation they abandoned their claim to rescission and were not equitably entitled to such rescission when they amended their bill and changed the whole ground of their suit in November, 1915, because, on account of the ruinous condition of the building, they were unable to convey it back in the condition it was in when they commenced this suit solely for reformation.

A decree therefore will be advised dismissing the bill.